# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

AARON GROSS, on behalf of himself and on
behalf of a class of all others similarly situated,

                          Plaintiff,

     v.

MADISON SQUARE GARDEN
ENTERTAINMENT CORP.,

                       Defendant.

Index No. _____

**SUMMONS**

Plaintiff designates New York
County as the place of trial.  The
basis of the venue designated is
because all parties reside within
the state.

TO THE ABOVE-NAMED DEFENDANT:

        **YOU ARE HEREBY SUMMONED** to answer the complaint in this action and to

serve a copy of your answer, or, if the complaint is not served with this summons, to serve a notice

of appearance, on the plaintiff's attorneys within 20 days after the service of this summons,

exclusive of the day of service, or within 30 days after the service is complete if this summons is

not personally delivered to you within the State of New York; and in case of your failure to appear

to answer, judgement will be taken against you by default for the relief demanded in the complaint.

DATED: New York, New York
       March 24, 2023

Respectfully submitted,

Israel David
israel.david@davidllc.com
Hayley Lowe
hayley.lowe@davidllc.com
Blake Hunter Yagman
blake.yagman@davidllc.com
Madeline Sheffield
madeline.sheffield@davidllc.com

**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Tel.:        (212) 739-0622
Facsimile:   (212) 739-0628

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

AARON GROSS, on behalf of himself and on
behalf of a class of all others similarly situated,

                        Plaintiff,

         v.

MADISON SQUARE GARDEN
ENTERTAINMENT CORP.,

                    Defendant.

Index No. _____

**CLASS ACTION**
**COMPLAINT**

---

Plaintiff Aaron Gross, on behalf of himself and all others similarly situated, by and through

his undersigned counsel, based upon information and belief as well as the investigation of counsel,

brings the following Class Action Complaint (the "Action") against the Defendant, Madison

Square Garden Entertainment Corp. ("Defendant" or "MSG").

## INTRODUCTION

1.      This lawsuit arises from MSG's unlawful use of biometric data to benefit its bottom

line.  MSG improperly uses the biometric data that it collects from consumers to systematically

identify and remove any attorney from its venues who may be associated with a law firm that dares

to file a lawsuit against MSG.  Regardless of the size or legitimacy of the claim, litigants, their

attorneys, any employee of a related law firm, and business foes alike risk being banned for

challenging MSG.  MSG has leveraged this threat of exclusion (and unceremonious on-site

expulsion) from the epicenters of New York City entertainment that MSG owns and controls to

induce a valuable chilling effect on litigation against MSG. The objective of MSG's policy is clear

— to profit from the use of its facial recognition technology system by deterring litigation and, in

turn, reducing MSG's significant litigation expenses.  MSG's campaign not only shocks the

Case 1:23-cv-03380-LAK-JLC   Document 1-1   Filed 04/21/23   Page 5 of 28

conscience, as articulated by the numerous public officials that have spoken out on this matter —

it is also unlawful.  As set forth in this complaint, MSG's profit-motivated use of its facial

recognition technology system violates the protected (and valuable) privacy rights of consumers

in their unique and personal biometric identifier information.

2.      Madison Square Garden, widely known as the "Most Famous Arena on Earth," has

served as the quintessential New York City sports and concert arena since it was founded in 1879.

Madison Square Garden is the current home of the New York Knicks basketball team and the New

York Rangers hockey team, and serves as the principal New York City concert venue for the

world's most famous musical performers.  MSG also owns and controls several of New York

City's other iconic entertainment venues, including Radio City Music Hall.[1]  The historical and

cultural significance of the range of events that the MSG Venues have collectively played host to

is staggering — from global music superstars and comedians, to the Grammys, the NBA Finals,

the Westminster Kennel Dog Show, and everything in between.  The MSG Venues offer unique,

exclusive, once-in-a lifetime experiences to the millions of New Yorkers and visitors from around

the United States and the world that visit them each year.

3.      MSG has implemented a facial recognition technology system in order to collect

and analyze biometric identifiers from each person that enters the MSG Venues.  MSG misuses

this protected data to implement a systematic campaign to chill potential litigation against it.  MSG

accomplishes this by maintaining a database of biometric data associated with banned persons (any

attorney employed by a law firm that has sued MSG) and conducting a facial recognition scan of

each person that enters an MSG Venue so that it can identify and eject any banned person.  In

---

[1] Madison Square Garden, Radio City Music Hall, the Beacon Theatre, and the Theatre at Madison Square Garden
are each owned and controlled by MSG and are referred to collectively herein as the "MSG Venues" or the "Venues."

2

order to implement this system, MSG shares all of this biometric data with at least one third-party

vendor.

     4.     This shameless practice has resulted in hardworking, decent people being banned

— and, in some cases, thuggishly evicted — from MSG and its sister properties.  For example,

MSG recently used facial recognition to remove a mother chaperoning her daughter on a Girl

Scouts trip to the Rockette's Christmas Spectacular at Radio City Music Hall merely because the

mother was employed by a law firm that brought a lawsuit against MSG (notwithstanding that the

woman had no role in the lawsuit).

     5.     The message of this campaign is clear — if you sue MSG, not only you, but those

associated with you may never again be able to watch your favorite sports team in its home venue,

see an exclusive performance by your favorite artist or comedian, take your children to see the

Rockettes at Christmas, attend a convention, or more generally, set foot in any of these iconic and

culturally significant venues for any purpose.  Bringing a claim against MSG, no matter the nature

or merit of it, means foregoing participation in cornerstones of New York City's rich entertainment

landscape, and perhaps enduring the humiliating experience of being publicly removed by security

in front of family and friends.

     6.     In 2021, New York City joined the growing number of states and municipalities

that have enacted laws to prevent corporations from surreptitiously collecting and profiting from

consumer biometric identifiers, as MSG is doing here.  *See* N.Y.C. Admin Code §§ 22-1201-1205

(the "NYC Biometrics Law").

     7.     The clear object of MSG's campaign to deter litigation is financial benefit to MSG,

and this campaign is accomplished by and through collection and analysis of consumer biometric

data.  MSG engages in this outrageous conduct in order to reap the substantial profits attendant to

3

mitigating litigation costs by deterring lawsuits. Accordingly, this blatant profiteering from consumer biometric identifiers obtained at MSG Venues falls squarely within the conduct prohibited by the NYC Biometrics Law.

8.      MSG's use of this information in furtherance of its business interests also constitutes an actionable violation of the Right of Privacy conferred by Article 5 of the New York Civil Rights Law. *See* N.Y. Civ. Rights §§ 50, 51 (the "NY Privacy Law").

9.      New Yorkers value their fundamental right to privacy. MSG's abusive use of facial recognition technology, through which it uses consumer biometric data for its own pecuniary gains, plainly violates these fundamental rights, including as reflected in the NYC Biometrics Law and NY Privacy Law.

10.     Plaintiff brings this Action, on behalf of himself and all others similarly situated, to vindicate the privacy rights of all persons who visited the MSG Venues in New York City and had their biometric identifier information collected by Defendant's facial recognition technology system during the period commencing July 9, 2021, and ending on the earlier of the date of entry of judgment in this Action or on the date MSG ceases to engage in the unlawful practices complained of herein. Plaintiff seeks: actual damages; statutory monetary damages pursuant to N.Y.C Admin. Code § 22-1203 for each of MSG's negligent, intentional and/or reckless violations of N.Y.C Admin. Code § 22-1202(b) with respect to each Class member; actual and exemplary damages pursuant to NY Civ. Rights § 51, for MSG's violations of the privacy rights of each Class member, as provided by NY Civ. Rights § 50; reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses incurred by Plaintiff in connection with this Action, as provided by N.Y.C Admin. Code § 22-1203; and such other and further relief, as the

Court may deem appropriate, including an injunction prohibiting MSG's continued violations of the NYC Biometrics Law and NY Privacy Law, together with pre and post-judgment interest.

## JURISDICTION AND VENUE

11.    This Court has personal jurisdiction over Defendant because it maintains its principal place of business in New York, New York.  This Court also has personal jurisdiction over Defendant because the events giving rise to this Action occurred in New York, New York.

12.    Venue is proper in this Court because Defendant maintains its principal place of business in New York County.  Additionally, the conduct giving rise to the allegations and claims asserted in this Action originated and occurred in New York County.

## PARTIES

13.    Plaintiff Aaron Gross is a resident of New York State.  Mr. Gross purchased a ticket for, and attended, a concert at Madison Square Garden on or about February 10, 2022.

14.    Upon Plaintiff's attendance at Madison Square Garden, Defendant collected, retained, converted, and/or stored Plaintiff's biometric identifier information.  Defendant further retained, converted, stored, shared and/or otherwise transacted in Plaintiff's biometric identifier information in order to implement its Litigation Deterrent Policy (as that term is described and defined below), and has accordingly profited from such use of Plaintiff's biometric identifier information.  Plaintiff did not provide consent, written or otherwise, to Defendant to sell, lease, trade, or share in exchange for anything of value or otherwise profit from the transaction of his biometric identifier information, or otherwise use any such information for the purposes of trade.

15.    Defendant Madison Square Garden Entertainment Corp. is a Delaware corporation, registered with the New York Secretary of State to conduct business in the State of New York as a foreign business corporation.  MSG identifies its principal executive offices as being located at

Two Pennsylvania Plaza, New York, New York.  In addition, the MSG Venues, owned and operated by MSG, are each located in New York, New York.

16.    MSG is a publicly traded corporation (NYSE: MSGE), that describes itself as operating through "three operating segments":  (1) "Entertainment[,]" which includes the MSG Venues, entertainment production, and a "bookings business, which features a variety of live entertainment and sports experiences"; (2) "MSG Networks[,]" which includes MSG's "regional sports and entertainment networks[,]" a streaming application, "and other digital properties"; and (3) "Tao Group Hospitality[,]" consisting of a controlling interest in global hospitality and nightlife company TAO Group Holdings LLC.

## FACTUAL ALLEGATIONS

### A.  The MSG Venues

17.    MSG owns and controls many of New York City's most iconic entertainment venues, including Madison Square Garden, Radio City Music Hall, and the Beacon Theatre.  The historical and cultural significance of the range of events that the MSG Venues have collectively played host to is unmatched:  the concerts of nearly every major musical act over the last 60+ years, from the Rolling Stones, John Lennon and Sir Elton John to Madonna and Britney Spears; both Democratic and Republican National Conventions; the Grammy and Tony Awards; 100+ years of Westminster Kennel Dog Shows; the biggest names in comedy from George Carlin to Jerry Seinfeld; live tapings of American television mainstays, Jeopardy and the Wheel of Fortune; the NBA and NFL drafts; major sporting events, including the Stanley Cup Finals and NBA Finals; and many of the biggest fights in boxing history, including the first iconic Muhammad Ali – Joe Frazier matchup.

6

Case 1:23-cv-03380-LAK-JLC   Document 1-1   Filed 04/21/23   Page 10 of 28

18.     In particular, Madison Square Garden — the namesake asset and crown jewel of the MSG empire — has served as the quintessential New York City sports and concert arena since it was founded in 1879.  Madison Square Garden is the current home of the New York Knicks basketball team and the New York Rangers hockey team, and serves as the current New York City concert venue of choice for the most iconic global pop superstars, among other widely attended sports, music, and cultural events.

19.     MSG has the lucrative privilege of acting as steward of these historic and culturally significant venues, as part of its multi-billion dollar sports, entertainment, and hospitality empire.

20.     Countless millions of New Yorkers as well as visitors from across the United States and the globe, attend sports and entertainment events at MSG Venues each year.  The MSG Venues offer a variety of complete entertainment experiences, including food, drinks, and memorabilia for purchase.

21.     For some MSG Venue patrons, attendance at MSG events may represent time-honored traditions — generations of Knicks fans have cheered on their team at Madison Square Garden season-in and season-out.  Likewise, generations of families have treasured an annual trip to Radio City Musical Hall for the Rockettes Christmas Spectacular.  For countless New Yorkers, attendance at MSG events is also a centerpiece of the rich and varied cultural life offered by New York City.  And, for many, attendance at an MSG Venue event is a once-in-a-lifetime opportunity. Indeed, due to the exclusive nature of many of the events hosted and produced by MSG, an MSG Venue may be the only place in the world that a particular entertainment experience is available.

**B.  Biometric Data and Facial Recognition Technology**

22.     As discussed in detail below, each of the MSG Venues employs facial recognition technology to collect biometric data from patrons of the MSG Venues and from other persons.

7

23.     Biometrics are unique biological or physiological characteristics that may be used individually or in combination to identify an individual.  Biometric identifiers include the iris and retina of the eye, facial geometry, hand geometry, and, most familiarly, the fingerprint.

24.     Biometric technologies, at the most basic level, collect biometric data and use that data to identify or recognize a person based upon some unique biometric identifier.  Specifically, as relevant here, facial recognition technology is a category of biometric technology that analyzes facial features to identify a person.

25.     Facial recognition technology operates by detecting an individual's face in person or from an image.  A facial recognition technology system then generates a unique faceprint (similar to a fingerprint) by performing an analysis of facial geometry and other features of the face, such as the distance between the nose and the mouth, the shape of the cheekbones, depth of eye sockets, and contour of the lips, ears and chin, among other unique measurements and features.

26.     Faceprints generated by facial recognition technology systems may be used by the system to verify a person's identity by conducting a one-to-one comparison.  For example, U.S Customs and Border Protection uses facial recognition technology to biometrically confirm the identity of travelers that come to the United States by comparing a photo taken of the traveler at arrival against the passport photo presented by the traveler.  Facial recognition technology systems may also compare an individual's face print against a larger database of face prints in order to determine whether the individual matches any person included in the database.  As discussed in greater detail below, this is the type of facial recognition system employed by MSG and that is at issue in this Action.

**C.  The New York City Council Enacts the NYC Biometric Data Protection Law to Protect the Privacy Rights of New York Consumers**

27.     The expanded use of biometric technology, in particular by private corporations, and the inherently personal and sensitive nature of biometric data has revealed the critical need to protect and secure consumer biometric data.  States and municipalities throughout the United States have accordingly responded by enacting biometric data protection laws in order to protect privacy rights associated with an individual's biometric identifiers and prevent corporations from abusing and profiting from consumer biometric data.

28.     The New York City Council enacted the NYC Biometrics Law, effective July 9, 2021.  As reflected in the transcripts of related hearings and committee reports, the NYC Biometrics Law was enacted to address the unique consumer protection concerns related to privacy and personal data that have arisen from developments in facial recognition and other biometric technology and, in particular, the concern that private databases of this information "may be sold, shared, or used in ways that the consumer does not understand or consent to[.]"

29.     As relevant to this Action, Section 22-1202 of the NYC Biometrics Law governs the collection, use, and retention of biometric identifier information by any commercial establishment.[2]

---

[2] The statute defines "biometric identifier information" as "a physiological or biological characteristic that is used by or on behalf of a commercial establishment, singly or in combination, to identify, or assist in identifying, an individual, including, but not limited to: (i) a retina or iris scan, (ii) a fingerprint or voiceprint, (iii) a scan of hand or face geometry, or any other identifying characteristic." (N.Y.C. Admin Code § 22-1201.)

"Commercial establishment" is defined as "a place of entertainment, a retail store, or a food and drink establishment." (*Id*.)  "Place of Entertainment" is defined as "any privately or publicly owned and operated entertainment facility, such as a theater, stadium, arena, racetrack, museum, amusement park, observatory, or place where attractions, performances, concerts, exhibits, athletic games or contests are held."  (*Id*.)  A "food and drink establishment" is defined as "an establishment that gives or offers for sale food or beverages to the public for consumption or use on or off the premises, on or off a pushcart, stand or vehicle."  (*Id*.)

30.    In addition to imposing disclosure requirements on commercial establishments that collect biometric data from customers, the statute provides that:

> "It shall be unlawful to sell, lease, trade, share in exchange for anything of value or otherwise profit from the transaction of biometric identifier information."
> N.Y.C. Admin Code § 22-1202(b).

**D.  MSG Collects Biometric Data and Implements the Litigation Deterrent Policy**

31.    MSG has implemented a facial recognition technology system at each of the MSG Venues.  MSG utilizes this system to collect biometric identification information from every consumer that attends an event at, or otherwise patronizes, the MSG Venues.

32.    As part of MSG's facial recognition technology system, MSG also maintains a database of biometric data associated with persons that MSG has banned from its venues.  When a person enters an MSG Venue, that person's biometric data is collected and analyzed against the database of banned persons for a potential match.  According to MSG:

> "The facial recognition technology system does not retain images of individuals, with the exception of those who were previously advised they are prohibited from entering our venues, or whose previous misconduct in our venues has identified them as a security risk."

33.    In order for MSG to utilize its facial recognition technology system to identify and remove banned individuals from MSG Venues, two categories of biometric data must be collected, analyzed, and/or maintained by the system.  First, MSG must maintain a database of biometric data associated with banned persons, against which all consumer biometric data it collects is analyzed.  Second, MSG must collect biometric data associated with any consumer that may enter the MSG Venues so that it is able to systematically identify any such consumer that is a banned person.

34.    The MSG facial recognition technology system is designed, implemented, operated, and managed by at least one third-party vendor with whom MSG shares, transfers to, or

otherwise provides access to the biometric data it collects from consumers, or that MSG otherwise retains as part of MSG's facial recognition technology system.

### E. The Unlawful MSG Litigation Deterrent Policy

35.     MSG's own statements and actions in recent months have made it clear that a principal purpose of its facial recognition technology system is to systematically implement — and profit from — a litigation deterrent policy predicated on banning and ousting attorneys from the MSG Venues.  As part of this policy, MSG is weaponizing its facial recognition technology system and the consumer biodata it collects to intimidate actual and prospective litigants and their attorneys from pursing potentially meritorious lawsuits against MSG.

36.     As explained by an MSG spokesperson:

> "MSG instituted a straightforward policy that precludes attorneys from firms pursuing active litigation against the Company from attending events at our venues until that litigation has been resolved."[3]

37.     MSG has proceeded to aggressively enforce this policy at MSG Venues by and through its facial recognition technology system.  MSG maintains a database of biometric data associated with banned attorneys (and related parties).  Biometric identifiers are obtained from every person that enters an MSG Venue and analyzed for a match with a banned person.  If a match is found, that person is unceremoniously ejected from the Venue.  This policy and the actions taken to enforce it are collectively referred to herein as the "Litigation Deterrent Policy" or the "Policy."

38.     To effectuate and implement the Policy, MSG needs to use (and does use) biometric data associated with each and every consumer that enters an MSG Venue in order to identify any banned persons among them.  As such, collection and use of all MSG Venue consumer biometric

---

[3] MSG has issued notices to approximately 90+ New York City area law firms engaged in litigation against MSG, banning any attorney from these firms from entering its MSG Venues.

Case 1:23-cv-03380-LAK-JLC   Document 1-1   Filed 04/21/23   Page 15 of 28

data, not just biometric data associated with banned persons, is essential to the effectiveness and significant pecuniary value of the Litigation Deterrent Policy.

39.     The way in which the Policy is implemented — with the clear intent to publicly humiliate and intimidate persons subject to it (whether they are aware or not that they are banned and subject to the Policy) — is central to MSG's goal of maximizing the deterrent effect and accordant pecuniary value of the Policy.  A growing number of attorneys have been removed from the MSG Venues by security, many of whom have no involvement with any lawsuit against MSG.

40.     Media has reported on a number of these instances, as the affected attorneys have spoken out about their experiences:

   a.   A New Jersey mom, Kelly Conlon, an associate at David, Saperstein & Salomon, chaperoned her daughter's Girl Scouts field trip to Radio City Music Hall to see the Rockettes Christmas Special in November 2022.  Ms. Conlon was identified by facial recognition technology and removed by security.  Ms. Conlon had no actual role in any lawsuit against MSG, other than being employed by a law firm that is counsel of record in a lawsuit against MSG.

   b.   Benjamin Pinczewski, a 61-year-old personal injury and civil rights lawyer, was stopped in January 2023 by two MSG security guards after passing through the metal detector at Madison Square Garden.  He explained that he was not working on any lawsuit against MSG, but he was removed by security because he works for a firm, Elefterakis, Elefterakis & Panek that has filed a lawsuit against MSG.

   c.   A lawyer attending a concert at Madison Square Garden in October 2022 was stopped by security who demanded her identification, proceeded to advise her that she was identified by facial recognition software, then ejected her from Madison Square Garden.  The lawyer was not involved in MSG litigation and was not aware of the ban before attempting to attend the concert.

   d.   Fourteen days after filing a complaint in September 2022 against MSG on behalf of consumers alleging violations of New York Arts and Cultural Affairs Law by MSG, MSG revoked the Knicks season tickets of attorney of record, Larry Kutcher. Mr. Kutcher, a devoted Knicks fans, had continuously held Knicks season tickets for nearly 50 years prior to the revocation.

   e.   Nicolette Landi, an attorney with the firm of Burns & Harris, attempted to attend a Mariah Carey Christmas concert in December 2022, but was denied entry and asked

12

to leave Madison Square Garden premises, because her firm represents a plaintiff against MSG.

f.  Attorney Alexis Majano was entering a Knicks game in November 2022 with friends when he was stopped by security, asked whether he worked at the firm of Sahn Ward Braff Koblenz, and ejected from the game.  Sahn Ward Braff Koblenz represents a plaintiff that tragically fell from a skybox at Madison Square Garden.

**F.  Public Officials Denounce the Policy and the NY Attorney General Condemns the Policy as Wrongfully Dissuading Litigation in Potential Violation of NY Law**

41.    The Litigation Deterrent Policy has deservedly drawn almost unprecedently broad and public condemnation from government officials and the judiciary as unethical and potentially illegal, including a formal information request from New York Attorney General Letitia James.  While many businesses would immediately attempt to rectify, or at least re-evaluate, a practice in response to such grave criticisms from government officials, MSG has not flinched and has persisted with the Litigation Deterrent Policy in furtherance of its own pecuniary interests.

42.    By letter, dated January 24, 2023, Attorney General James issued a notice to MSG, recognizing the deterrent effect of the Policy on litigation against MSG and otherwise citing a number of bases pursuant to which the Policy may be illegal, stating in relevant part:

> "We write to raise concerns that the Policy may violate the New York Civil Rights Law and other city, state, and federal laws prohibiting discrimination and retaliation for engaging in protected activity.  Such practices certainly run counter to the spirit and purpose of such laws, and laws promoting equal access to the courts: forbidding entry to lawyers representing clients who have engaged in litigation against the Company may dissuade such lawyers from taking on legitimate cases, including sexual harassment or employment discrimination claims.  And attempts to dissuade individuals from filing discrimination complaints or encouraging those in active litigation to drop their lawsuits so they may access popular entertainment events at the Company's venues may violate state and city laws prohibiting retaliation." (Internal citations and parentheticals omitted.)

43.    Other prominent public officials have also publicly denounced or commented on the Litigation Deterrent Policy.

44.     On January 15, 2023, eight New York Lawmakers, including Congressman Jerrold

Nadler, wrote a letter to MSG demanding that it cease using facial recognition technology to locate

and remove attorneys from its venues.  In that letter, the Lawmakers expressed concern that

Defendant "is using facial recognition…to chill free speech and access to the courts."  The letter

further reminded MSG of the $43 million New York State tax abatement, New York City Special

Permit, and state and city-issued licenses that MSG receives because its Venues are places of

public accommodation.  Consistent with the shameless spirit of the Policy, one of the signatories

to the Letter, Assemblyman Tony Simone, was subsequently disinvited from dropping the puck at

a "Hockey is for Everyone" event at Madison Square Garden.

45.     By letter, dated January 27, 2023, New York State Senator Brad Hoylman-Sigal

wrote to NBA Commissioner, Adam Silver, and NHL Commissioner, Gary Bettman, regarding

MSG's "outrageous use of facial recognition technology to identify and ban members of the public

from Madison Square Garden because they have been deemed hostile to the legal and financial

interests of MSG."  In that letter, Senator Hoylman-Sigal further "implore[d]" the NBA and NHL

to "to use [their] power and discipline MSG and Mr. Dolan for these alarming abuses unless they

immediately cease profiling fans with facial recognition technology for non-security purposes[,]"

stating, in relevant part:

> "I recognize that facial recognition software can aid in securing large venues, but
> Mr. Dolan has abused this technology to fuel his personal vendettas —not make
> games safer. [. . . .] Recent reporting indicates that facial recognition has enabled
> Mr. Dolan's bullying tactics, by allowing him to eject attorneys, celebrities, and
> fans alike from attending Knicks and Rangers games.  Contrary to statements made
> by representatives of MSG, these practices have nothing to do with ensuring the
> safety and enjoyment of basketball and hockey fans. Instead, as NYS Attorney
> General Letitia James has pointed out, they may violate New York law."

46.     Members of the judiciary presiding over lawsuits involving MSG have also

addressed this Policy when the attorneys before them became subject to the ban:

a.  The Honorable Chancellor Kathleen St. J. McCormick (Del.Ch.) of the Delaware Court of Chancery, who is currently presiding over shareholder litigation involving MSG, called the Policy "the stupidest thing I've ever read" and "totally crazy."

b.  Chancellor McCormick further ridiculed the Policy and the pretext of any purported security purpose claimed by MSG, facetiously stating that banned attorneys may do "something as horrific as watch a play, a sporting event, order a hot dog, or even use the bathrooms, these sorts of threatening acts."

c.  The Honorable Judge Lyle E. Frank (Sup. Ct., New York County), who is presiding over a lawsuit against MSG arising from New York's Arts and Cultural Affairs Law, easily recognized the litigation deterrent purpose and effect of the Policy, stating, "there appears to be no rational basis for the policy instituted by the defendants except to dissuade attorneys from bringing suit against them."

47.  MSG is remarkably undeterred by the numerous denouncements of the Policy by high-profile public officials.  MSG has also demonstrated that it is wholly disinterested in answering for its conduct or working with concerned public officials — when the New York City Council had a hearing on the matter, MSG failed to even send a representative to attend or speak on its behalf.  While the issuance of Attorney General James' letter (alone) would inspire most corporations to pause implementation and reevaluate the policy at issue, MSG persists unabashedly with its unlawful policy.

48.  MSG has also demonstrated a willingness to bring its thuggish tactics to any foe, including public officials.  The New York State Liquor Authority recently opened an investigation into whether the Policy violates state liquor laws by closing the premises to certain members of the public — a violation which could result in the revocation of the MSG Venues' liquor licenses. MSG responded with a lawsuit and press release promising to be a formidable opponent to what it referred to as the "gangster-like governmental organization."

15

Case 1:23-cv-03380-LAK-JLC   Document 1-1   Filed 04/21/23   Page 19 of 28

49.     Most recently, in March 2023, MSG admitted to having a New York State Liquor Authority official followed by a private investigator that tailed the official for over 100 miles, including to his home, then proceeded to conduct video surveillance of the official's home.

50.     Taken together, MSG's actions indicate that it simply does not appear to care whether the Policy, or its related actions, are illegal as long as its pecuniary interests are served.

### G.   MSG Profits from the Litigation Deterrent Policy in Violation of NYC Biometric Data Protection Law and NY Civil Rights Law

51.     MSG has deployed the biometric data that it collects from consumers in order to implement the Litigation Deterrent Policy for its own pecuniary benefit.  The purpose, intent, and result of the Litigation Deterrent Policy is a financial benefit to MSG.  And, because consumer biometric data is the essential (and predominant) input and engine for the Policy, MSG is profiting from its use of the biometric data.

52.     MSG has identified litigation as a significant cost to its organization and has effectively designed the Policy to deter litigation and, in turn, reduce its litigation costs to benefit MSG financially.

53.     While any large corporation is incentivized to manage and mitigate litigation risk and expense, the incentive and related financial benefit is particularly significant for MSG.  MSG has significant litigation risk and expense based both on the nature of its business and how management operates the business.  With respect to the nature of its business, millions of people enter the massive MSG Venues each year — venues that are filled with stairs, escalators, and seats and boxes and ledges in high places — offering millions upon millions of opportunities (particularly when, as here, enormous amounts of alcohol are involved) for consumers to trip, fall, or slip, among other accidents and injuries, any of which may result in a lawsuit against MSG, as the owner of the premises.  MSG also employs thousands of persons and has been subject to

16

personnel-related claims, including at least one meritorious sexual harassment lawsuit. The way in which MSG manages its business also appears to invite litigation. For example, in recent years, MSG has been subject to multiple significant shareholder lawsuits.

54. As such, MSG's efforts to actually deter litigation via its unique (and outrageous) Policy meaningfully lowers the financial risks attendant to MSG's extraordinary litigation expenses.

55. The Policy effectively deters litigation. And, the deterrent effect is particularly powerful because a ban not only affects an attorney actually involved in a case against MSG, but all other attorneys within a law firm. These bans are also implemented in a manner that appears intended to inflict humiliation and fear, and a ban from MSG Venues is particularly devastating for many people. A banned person is not simply excluded from a single venue or restaurant, but a collection of venues that are at the center of culture and entertainment in New York City and the world. Subjecting oneself to a ban under the Policy in order to take on a lawsuit may represent a change in lifestyle for some New Yorkers, could mean exclusion from time-honored family traditions, or could mean missing the opportunity to attend a once-in-a-lifetime event. For many attorneys, it is simply not worth it to subject themselves, their family, and their entire staff to the consequences of a ban.

56. As also noted by Attorney General James, this deterrent factor is most likely to impact the ability of the most vulnerable categories of plaintiffs with meritorious claims against MSG, including discrimination claimants and persons that are seriously injured, but who may not have a high enough value claim to persuade an attorney to accept the consequences of a ban on the attorney's firm if the attorney were to take the case.

57.    The purpose of Section 22-1202(b) is to prevent corporations from using consumer biometric data for the corporation's own pecuniary benefit, just as MSG is doing here.

58.    MSG realizes a clear financial benefit from the deterrent effect of the Policy through a reduction in litigation costs (including the significant costs of settlements and adverse judgments).  This benefit is realized only by and through the collection, retention, and analysis of biometric data.  MSG is, accordingly, deriving a concrete (and substantial) pecuniary benefit from the biometric data, which is unlawful pursuant to the statutory prohibition of Section 22-1202(b) of NYC Biometrics Law that MSG may not "otherwise profit" from the consumer biometric data it collects and/or shares.

59.    MSG's Litigation Deterrent Policy is borne of a strategic initiative to deter litigation against MSG based on a clear and compelling financial interest, the natural purpose and effect of which is to deliver financial benefit to the corporation by significantly reducing a material and substantial cost of its operations.  Because the Policy is based upon and requires the collection and use of biometric data associated with each and every MSG Venue customer, the Litigation Deterrent Policy violates the NYC Biometrics Law prohibition on profiting from consumer biometric data.

60.    MSG's use of biometric data pursuant to the Policy, in furtherance of its business interests, likewise constitutes a use of that information for trade purposes in violation of the Right to Privacy provided by Section 50 of the NY Civil Rights Law.

61.    MSG's continued violations of NYC Biometrics Law and NY Civil Rights Law should be enjoined, and Plaintiff and the proposed class should be compensated for MSG's violations in accordance with all applicable laws and legal doctrines, including the damages

18

remedies provided by Section 22-1203 of the NYC Biometrics Law and Section 51 of the New York Civil Rights Law.

## CLASS ACTION ALLEGATIONS

62.     Plaintiff seeks to certify a class consisting of consumers who fall under the following definition ("Class Members" or the "Class"):

> **Class Definition.**  All persons who visited an MSG venue in New York City and had their biometric identifier information collected by Defendant's facial recognition technology system during the period commencing July 9, 2021, and ending on the earlier of the date of entry of judgment in this Action or on the date MSG ceases to engage in the unlawful practices complained of herein.

63.     Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant.

64.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

65.      **Numerosity.**  The members of the Class are so numerous that individual joinder of all Class Members is impracticable.  Class Members number in the millions.  The precise number or identification of members of the Class are presently unknown to Plaintiff but may be ascertained from Defendant's books and records.  Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

66.      **Commonality and Predominance.**  Common questions of law and fact exist as to all members of the Class, which predominate over any questions affecting individual members of the Class.  These common questions of law or fact include, but are not limited to, the following:

i.      Whether Defendant collected biometric identifier information from customers;

ii.     Whether Defendant leased, traded, shared in exchange for anything of value, or otherwise profited from the transaction of biometric identifier information;

iii.    Whether Defendant violated N.Y.C. Admin Code § 22-1202(b);

iv.     Whether any such violation of N.Y.C. Admin Code § 22-1202(b) was negligent, reckless, and/or intentional;

v.      Whether Defendant used photographic biometric identifier information for trade purposes;

vi.     Whether Defendant violated N.Y. Civ. Rights §§ 50, 51;

vii.    Whether Defendant has been unjustly enriched by Defendant's collection and use of biometric identifier information associated with Plaintiff and the Class; and

viii.   Whether Plaintiff and the Class are entitled to actual damages, statutory damages, exemplary damages, and/or injunctive relief.

67.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and the other Class Members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

68.     **Typicality.** Plaintiff's claims are typical of the claims of the other Class Members because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

69.     **Adequacy of Representation.** Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and Plaintiff's interests do not conflict with the interests of the Class Members he seeks to represent. Plaintiff has retained counsel competent and

20

experienced in complex commercial and class action litigation. Plaintiff and his counsel intend to prosecute this action vigorously for the benefit of all Class Members. Accordingly, the interests of the Class Members will be fairly and adequately protected by Plaintiff and his counsel.

70.     **Superiority.**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class Members to individually seek redress for Defendant's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## COUNT I

### Violation of New York City Biometric Identifier Information Protection Code
### N.Y.C. Admin. Code § 22-1202(b)

71.     Plaintiff restates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

72.     Defendant owns and operates the MSG Venues, which are commercial establishments subject to N.Y.C. Admin Code § 22-1202.

73.     Defendant employs a facial recognition technology system at the MSG Venues, which collects, retains, converts, analyzes, stores, and/or shares biometric identifier information of persons who enter the MSG Venues, including Plaintiff and members of the proposed Class.

Case 1:23-cv-03380-LAK-JLC   Document 1-1   Filed 04/21/23   Page 25 of 28

74.     Defendant has used, shared, transferred, or otherwise transacted in biometric identifier information associated with consumers, such as Plaintiff and members of the proposed Class, including by sharing with or transferring such biometric data to at least one third-party, in order to implement and carry out the Litigation Deterrent Policy.

75.     Defendant profits from the Litigation Deterrent Policy by deriving pecuniary benefits from deterring litigation, among financial and other benefits.

76.     The Litigation Deterrent Policy violates N.Y.C. Admin Code § 22-1202(b).

77.     Defendant has acted willfully and recklessly, or, alternatively, negligently, in profiting from using, sharing, or transacting in consumer biometric identifier information in order to implement and carry out the Litigation Deterrent Policy.

78.     Plaintiff, and members of the proposed Class, have been damaged by Defendant and are entitled to actual and statutory damages, as provided by N.Y.C. Admin Code § 22-1203, for each of Defendant's violations of N.Y.C. Admin Code § 22-1202(b).

## COUNT II

### Violation of Right to Privacy
### NY Civ. Rights §§ 50, 51

79.     Plaintiff restates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

80.     Defendant employs a facial recognition technology system at the MSG Venues, which collects, retains, converts, analyzes, stores, and/or shares biometric identifier information, including photographic images, of persons who enter the MSG Venues, including Plaintiff and the members of the proposed Class.

81.     Defendant uses the photographic images it obtains through its facial recognition technology system to implement and carry out the Litigation Deterrent Policy.

82.     The Litigation Deterrent Policy is implemented and carried out by Defendant for trade purposes, in furtherance of Defendant's own business purposes and for Defendant's own pecuniary benefit.

83.     Plaintiff and members of the proposed Class did not provide written consent to Defendant's uses of its photographic images for Defendant's trade purposes.

84.     Defendant has accordingly violated Plaintiff's and the Class's Right to Privacy, as provided by N.Y. Civ. Rights § 50.

85.     Plaintiff, and members of the proposed Class, have suffered actual damages as a result of Defendant's violations of N.Y. Civ. Rights § 50, and are entitled to damages as provided by N.Y. Civ. Rights § 51.

### Count III

### Unjust Enrichment

86.     Plaintiff restates and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

87.     Defendant received benefits from Plaintiff and Class members and unjustly retained those benefits at their expense.

88.     Defendant received benefits from Plaintiff and Class members in the form of their highly valuable data, specifically biometric data, that Defendant wrongfully obtained from Plaintiff and Class members for unlawful purposes.

89.     Defendants collected, stored, and used this data for its own gain, providing Defendant with economic, intangible, and other benefits, including highly valuable data which it used to implement the Litigation Deterrent Policy.

23

90.     The benefits that Defendant derived from Plaintiff and Class members rightly belongs to Plaintiff and Class members.  It is against equity and good conscience for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and practices alleged in this Complaint.

## RELIEF REQUESTED

91.     WHEREFORE, Plaintiff prays for judgment as follows:

A.   For an Order certifying this Action as a class action and appointing Plaintiff as class representatives, and his counsel as class counsel;

B.   For statutory damages awardable under N.Y.C. Admin Code § 22-1203, for Defendant's negligent, intentional and/or reckless violations of N.Y.C. Admin Code § 22-1202(b) with respect to each Class member;

C.   For actual and exemplary damages, including pursuant to NY Civ. Rights § 51, for Defendant's violations of the privacy rights of each Class member, as provided by NY Civ. Rights § 50;

D.   For equitable relief;

E.   For attorneys' fees, costs, including as provided by N.Y.C. Admin Code § 22-1203;

F.   For equitable and injunctive relief ordering Defendant to cease the unlawful practices described herein, including Defendant's continued violations of N.Y.C. Admin Code § 22-1202(b) and NY Civ. Rights §§ 50, 51;

G.   All other damages to be awarded in an amount to be determined as allowable by law, including pre and post-judgment interest; and

H.   Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

92.     Plaintiff hereby demands a jury trial for all claims so triable.

DATED: New York, New York
      March 24, 2023

Respectfully submitted,

Israel David
israel.david@davidllc.com
Hayley Lowe
hayley.lowe@davidllc.com
Blake Hunter Yagman
blake.yagman@davidllc.com
Madeline Sheffield
madeline.sheffield@davidllc.com

**ISRAEL DAVID LLC**
17 State Street, Suite 4010
New York, New York 10004
Tel.:        (212) 739-0622
Facsimile:   (212) 739-0628